RIVES, J.
The appellants in these cases are asserting tax titles as against the original owners of the lands and lots, forfeited and sold for the non-payment of taxes. The principles involved are, for the most part, common to all, and therefore they may now be considered, as they were argued, together.
It is conceded to be necessary, to uphold these titles, that all the ‘provisions of the acts of Congress under which they have arisen should be strictly complied with. They have been created by these enactments, and can have no *existence or validity save under and by their authorit3r. It is proper, therefore, to commence the investigation of them by ascertaining the character, the object, the meaning and the effects of these laws of Congress.
At the commencement of the late civil war, Congress addressed itself with promptness and energy to the task of providing extraordinary means to meet the emergencies of the occasion. Among these was a resort to a direct tax of $20,000,000, and its apportionment among all the States and Territories, with a curious disregard of the armed revolt of many of them, and a singular reliance on the usual civil processes of collection. It is reasonable, therefore, to presume that the application of this act of August 6, 1861, to such States was merely nominal, and that it was not expected that it would operate except where the authority of the United States was acknowledged and maintained. But a brief statement of the leading provisions of this act will assist us in determining the true intent and purport of the succeeding act of June 7, 1862. This first act abounded in wise and just precautions to secure proper notification of every step in the assessment and collection, to guard against surprise and sacrifice, and ensure the restoration of the property upon the payment of the Government dues. In the first place, personal chattels were to be distrained; and if not sufficient, then the lands were to be subject to sale; but only “so much thereof as might be necessary to satisfy the taxes due thereon, together with an addition of twenty per cent, to the said taxes;” and it was only where the lands were not divisible that the whole were to be sold, and the surplus of proceeds paid to the owner or deposited in the treasury for the use of the owner, with a saving to the owner, his heirs or personal representative, or “any person in their behalf,” of the right to redeem within two years, &c. In case of non-residents, a year was allowed them after publication *'by the collector that the tax had become due, and at its expiration their lands were not -subject to sale except upon sixty days’ advertisement, and then only “so much as might be necessary to satisfy the taxes,” &c. This was usual and normal legislation for collection of taxes; and no one can im- | pute to it the neglect of just precautions to protect the citizen from imposition. It may be accepted, therefore, as indubitable evidence that Congress was not ignorant of the rights of their constituents, nor derelict in their protection.
This law, however, proved a dead letter in the States where the Federal authority was successfully defied and resisted. It, therefore, gave rise to a new and distinct act, framed for the special purpose of following the army in its advances into the hostile States with tax commissioners, to assess and collect taxes; and for that purpose, to sell the lands upon which they were charged. It is very clear that Congress must have foreseen, that in cases of such military occupation, none of the adherents of the Confederacy would have remained on their lands; but, on the contrary, would have fled with their movable property before this hostile advance — thus, in a great measure, leaving the country to be used and settled as the laws of Congress might appoint. It seems that the appellees here all fled upon the breaking out of the rebellion, and left their houses, lots and lands to abide the ordinary incidents of military occupation. It was then in the province of Congress not only to collect taxes from these lands, but so to frame their laws to that end as to invite the refugee back to his allegiance, or provide for the settlement of his lands — if wholly abandoned by him — by other more loyal taxpayers, or appropriating them to the service of the government. Our State policy of forfeiture of lands for non-payment of taxes has been defended by this court on the distinct ground that it was designed and calculated to ^promote settlement, and thus remove “a serious check to population and the improvement of the country, and the development of its resources.” The object of Congress was not merely to raise its direct tax from the ‘ ‘in-surrectionary districts,” but it went further, and aimed at a settlement of them by a loyal population. Accordingly, this act is not simply entitled “an act for the collection of direct taxes in insurrectionary districts,” but its title bears the significant addition, “and for other purposes.” Among these latter is the palpable and unmistakable design of rendering the collection of these taxes auxiliary to the policy of transferring the title and possession of these lands either to the government, or to persons amenable to its laws and acknowledging its authority. How else can we account for the hasty and summary character of these proceedings; for dispensing with all the notices, indulgences and savings given by the act of August 6, 1861; for no longer distraining the goods in the first instance; for no longer limiting the sale to “so much of the land as might be needed,” &c., and taking away redemption from “any person in owner’s behalf,” and restricting it in terms to “the owner in person?” These provisions can, in my view, be only predicated of a design by Congress *558 to accomplish by this act a two-fold purpose : first, to raise money from taxes; and secondly, as an incident thereto, either to entice the recusant tax-payers back within its jurisdiction and power, or else transfer his forfeited lands to loyal citizens. The various provisions of this act for the redemption within sixty days after sale, by the owner in proper person or any loyal person having a lien, &c., upon taking the oath to support the constitution; for the extension of the time to redeem to those not implicated in the rebellion ; for leasing and selling to loyal persons, officers, musicians and privates of the army and navy; and conferring upon some of these a right of pre-emption, &c.
*A11 these satisfy me that these collections in “insurrectionary districts” were subsidiary to the policy of procuring loyal settlers upon these abandoned and forfeited lands, the taxes upon which the owner would not return in person to pay.
But it is said that this construction imputes to this law a culpable and discreditable indirection; and converts it into a disguised scheme of confiscation. I do not perceive the justice of this criticism or animadversion. I have sought to show that there is nothing covert or indirect in the act; but, on the contrary, that its meaning is plain and avowed, and its aim identical with all similar schemes of forfeiture. It is very properly stated by the counsel for the appellees, that forfeiture in such cases cannot be likened to the somewhat analogous result in the proceedings in rem for forfeiture. Here, it is a precedent denouncement of a penalty for default — a warning— a means of coercion legitimately employed to induce a prompt payment of taxes. It may be avoided in this way; and in those exceptional cases, where it cannot be thus avoided, there is usually such a saving, as consists with the indulgence or the severity of the Legislature in its scheme of public policy. Whenever, however, such laws of forfeiture have worked out their results, it is not usual for the Government to retreat from its position or abandon its declared policy, for the.plain reason that it contemplated beforehand these results, as consequences incidentally, though not primarily, of its legislation. And applications for relief, when not embraced by the terms of the law, are matters of favor, rather than of right. It is a source, doubtless, of regret, that under the circumstances of our late civil troubles, Congress had not been more lenient in this regard to the landed proprietors who fled before its armies, and were thus voluntarily out of the reach of its laws, in ignorance of their provisions, and *debarred bj' the war from any compliance with them. But that assuredly is not a consideration with this court to prevail against the rights and titles of purchasers from and under the government at these tax sales.
It is argued, however, that it is for the States alone, who are said to hold “the eminent domain” over the lands within their borders, to inflict such forfeitures; and that it is not competent for Congress to exercise such powers. It is a sufficient reply to say that the people of the States have, by the federal constitution, expressly delegated to Congress 1 ‘the power to lay and collect taxes” in such comprehensive terms as to comprise all modes of taxation, and among these, taxes on lands. Under the authority “to make all laws which shall be necessary and proper for carrying into execution the foregoing power,” Congress possesses, by delegation from the States, a right to all the means habitually exercised by them for the collection of taxes. I do not believe the concurrent powers of the Federal and State governments to impose taxes, and employ the usual agencies and coercion for their collection within the limits of the United States constitution, have been at any time called into question. Pending the adoption of the constitution, there was a great deal of earnest and able debate as to the expediency of this grant of unlimited taxation, and the danger of collision between the governments, State and Federal, from the exercise of such a concurrent power in both over the same subjects. Judge Story, in his Commentaries, remarks upon this subject with equal force and felicity: 1 ‘The triumph of the friends of the constitution, in securing this great fundamental source of all real effective national sovereignty was most signal; and it is the noblest monument of their wisdom, patriotism and independence. Popular feelings and popular prejudices, and local interests and the pride of State authority, and the jealousy of State sovereignty, were all *against them. Yet they were not dismayed; and by steadfast appeals to reason, to the calm sense of the people and to the lessons of history, they subdued opposition and won confidence. Without this power, the constitution would long since, like the confederation, have dwindled down to an empty pageant. It would have become an unreal mockery, deluding our hopes and exciting our fears. It would have flitted before us for a moment with a pale and ineffectual light, and then have departed forever to the land of shadows. ” 1 Stor. Comm. $ 948.
The elder Judge Tucker, in his notes on Blackstone, says in the same connexion, that “a candid review of this part of the federal constitution cannot fail to excite our just applause of the principles upon which it is founded.” 1 Tucker’s Blacks. App. 246. It is the just effect of such commanding authority to warn us against any judicial construction tending to weaken the force and efficiency of this vital and active principle of the constitution. Our late history and experience attest the straits to which the nation can be reduced, and the responsibilities it must assume in defending its existence against domestic violence. In view of past emergencies, and the future exigencies of the country, arising from wars foreign or domestic, it seems to me *559 extremely hazardous and impolitic to deny to Congress any of those incidental powers which are exerted by the States in the coercion of taxes, and in subjecting delinquent lands to forfeitures. To dilate upon the abuses, actual or fancied, of such powers, and the harshness of such measures, falls far short in my view of demonstrating any constitutional inhibition against the exercise of the former, or the adoption of the latter. It will be conceded that the powers of Congress and the States in the laying and collecting of direct taxes, are co-extensive and alike unlimited; but the effort is now made in these cases to establish an exception in this — that *the States can exact forfeiture upon default in non-payment of taxes; but Congress cannot, because such forfeiture is not necessary to the collection. Is not the principle, however, in both cases, precisely the same? Is not the forfeiture alike conditioned upon the default? And is it anything more or less than a begging of the question to assume, as this "reasoning purports, that this forfeiture, when imposed by Congress, does not promote the same end and designs which the State seeks to accomplish? Surely the forfeiture, in both instances, brings into the treasury the taxes, at least, and as to the surplus, puts it in trust for claimants; and incidentally removes future obstruction to the collection of the taxes, by securing settlers acknowledging the authority, and answerable to the process of the government.
By this reasoning, and by these considerations, I am led to the conclusion that these acts of Congress are constitutional, and that this court is bound by them. The next step in our enquiry is to ascertain and fix their proper meaning. It is a mistake to say, as it was said in the argument, that the act of June 7, 1862, was amendatory of the preceding general act of August 6, 1861. Such is not the fact. A recital only is made of the apportionment of the direct taxes by this first act, and of the obstruction of the civil authority in its execution, by reason of the rebellion. So far from being amendatory, this second act is a total departure from the first, and framed so as to meet a wholly different state of facts. It must be remembered that it was passed flagrante bello, and is remarkable as founded on a claim of allegiance from the insurgents, and their liability to payment of taxes as soon as the army could get military occupation of their lands or persons, and afford a footing for the operations of the tax-gatherer. Hence, this act sets out with charging the lands in “the insurrec-tionary districts” with their proportion *of the direct taxes according to the assessment and valuation previous to 1st January, 1861, and besides with a penalty of fifty per cent, of the tax, and proceeds to constitute these* taxes and penalty a lien upon the lands, without any other or further proceeding. Then, the owner is allowed sixty days after the award of his tax is fixed by the tax commissioners, to pay it and procure a certificate thereof, whereby his lauds are discharged from said tax. But if this is not done, “the title of, in and to each and every piece or parcel of land upon which said tax has not been paid, as thus provided, thereupon becomes forfeited to the United States, and upon the sale hereinafter provided for, shall vest in the United States or in the purchasers at such sale in fee simple, free and discharged from all prior liens, incum-brances, right, title and claim.” Sect. 7 Act June 7, 1862, 37th Cong., Sess. II, ch. 98, p. 422. This section is the most material to the consideration and decision of these causes. There are two branches of it: first, the forfeiture of title, and secondly, the ultimate vesting of that title. To declare the title, in the particular event, to be forfeited to the United States, clearly means that the title is divested out of the defaulting owner, and devolved upon the United States. It does not say that the delinquent lands shall be forfeited; but the title of the owner of them shall be lost to him, and forfeited to the United States. But how and for what purpose forfeited? The law itself gives the reply — not to be held by the United States for its own use, but to be sold for payment of taxes, penalty and costs; and that sale, under the scheme of the law, becomes the appointed mode in which the title ultimately vests. Now the condition of this sale is to the highest bidder, but in case no one bids to the amount of the penalty and costs, then it may be struck off to the United States at that sum.
By the subsequent amendatory act of February 6, 1863, *the privilege of bidding by the commissioners for and on behalf of the United States was enlarged to the extent of two-thirds of the assessed value; and in cases of lands selected under the direction of the President for government use, for war, military, naval, revenue, charitable, educational or police purposes, the commissioners, under the President, were at liberty to bid for them and have them struck off to the United States. In this way, the law appointed and designated two classes of purchasers at the sale — first the highest bidders, and secondly the United States, acting through the commissioners, and subject to the restrictions of these acts. The United States, as well as the highest bidders, might be purchasers at these tax sales. Sections 9th, 10th and 11th of the act of June 7, 1862, provide for the leasing and selling the lands thus bought by the United States. It is specially noticeable that the 11th section employs in this con-nexion the significant phrases, “said lands vested in the United States,” “such lands as may be unimproved and vested in the United States.” When, therefore, the latter clause of this 4th section declares that “the title, upon the sale hereinafter provided for, shall vest in the United States or the purchasers at such sale,” it has exclusive reference to the United States as a purchaser, and not as the sovereign, to *560 ■whom the forfeiture had been declared in the preceding clause. To my mind, it does not admit of a doubt, that the forfeiture is absolute and unqualified, and is not in anywise modified or restricted by this latter provision for the vesting of the forfeited title. The question is asked, why postpone the vesting of title to the date of the sale, if it was already in the United States by reason of the forfeiture? I answer, because the forfeiture puts it in the United States as the Uord paramount, and for the purpose of a sale to raise the taxes whose non-payment was the only justification of the forfeiture; and the vesting of *the title in the United States pertains to its other character as a purchaser at its own sale. This interpretation arises naturally out of the whole scheme and policy of the law, reconciles the two clauses, which áre supposed to conflict, and removes from this important section the charge of tautology, or else contradiction. I conclude, therefore, that this section simply means, that upon the specified default, the land • becomes forfeited to the United States, as a sovereignty, whose rightful and necessary demands had been defeated by this default; and is thenceforth held by the Government for the purpose of a sale to raise those dues; and that whenever, at such sale, the United States shall be authorized to bid and buy, the title shall thereafter be vested in the United States, as such purchaser. I need scarcely add, that in my view the land is sold not as the property of the delinquent tax-payer, but as the property of the government.
We have now, in the natural. course of this enquiry, reached another important point in this controversy; and it is as to the principle that underlies and regulates redemption. That we may have a clearer view of the question here made, lét us first state the successive provisions of the different acts upon this particular point. I will not go further back than the act of June 7, 1862; for as I have already stated, that was a new and remarkable precedent growing out of the severed ties of the Union and the anomalous condition of the citizens of the revolted States. By this act of 1862, the right of redemption within the prescribed limit of sixty days after sale, was not restricted to the owner, but was extended in terms to “any loyal person having lien or interest;” and in the case of “minors, insane, non-resident aliens or loyal citizens beyond seas,” a further period was allowed of two years from the sale. This term of sixty days was enlarged to one year, for the production of proof before the commissioners *that the applicant for redemption had taken no part in the rebellion, and had been thereby prevented from the payment of taxes; whereupon he, being the owner, was to be allowed by the commissioners further time to redeem, not exceeding two years from the day of sale. The amendatory' act of February 6, 1863, merely enlarged the capacity of the Government to acquire these, delinquent I lands at its own sales. But by the act of March 3, 1865, another condition was imposed upon redemption, namely, that the applicant shall swear that he had taken no part in the rebellion, nor given aid or comfort thereto, and shall satisfy the commissioners of the truth of such oath.
Here, then, the question arises upon these successive enactments, whether it was competent to Congress, after the right of redemption was once defined and prescribed, to change or alter it so as to divest or effect rights that had once attached. And this depends upon the legal effect of such laws, as impairing contracts, or destroying vested rights. If this right of redemption is to be regarded in the nature of a vested right held upon valuable consideration by cob-tract or otherwise, under and by virtue of the laws of Congress, there would be reason io doubt its power to superadd new conditions thereto, by subsequent laws; but if, on the contrary, this is to be deemed a mere legislative boon, there would seem to be no valid or reasonable objection to the power of Congress, by a retroactive law, to lay new conditions on its bounty or to withdraw it altogether. An analogous question was decided by this court under the Confederacy, touching the competency of the Confederate Congress to alter its substitute law so as to affect the rights of the principals and make conscripts of them, notwithstanding their purchased exemption under previous laws. Burroughs v. Peyton, and Abrahams v. Same, 16 Gratt. 470. Judge Robertson, who delivered the opinion of the court, held that “substitution *was permitted as an act of grace and favor on the part of the government, and not as a matter of contract. ’ ’ He went into a review of authorities to show that “rights and interests growing out of legislative measures of public policy, did not partake of the nature of contracts; and although acquired under them, were not to be considered as violated by subsequent legislative changes which might destroy them.” He quoted with especial favor the language of Justice Campbell in the case of The State Bank of Ohio v. Knoop, 16 How. U. S. R. 359; and applied it to the cases befpre him: “A plain distinction exists between statutes which create hopes and expectations, and those which form contracts.” To which of these categories these acts of Congress belong, is manifest upon their own perusal, and cannot be made plainer by argument or statement.
Having thus given my views on the constitutionality of these laws, and the interpretation to be placed on them, I have only now to dispose of the several points submitted to us for decision in these causes. After the advertisement of, but previous to, these sales, which all occurred in the month of January, 1864, applications and offers were made to the commissioners for the payment of taxes and charges, but rejected because not made by the owner in person, as required by the acts of Congress. In the case of Hunter, the offer was made *561 by a tenant of part of the premises; in the case of Cazenove, by one in possession, but not under any agreement with the owner; and in the case of Mrs. Fowle’s trustees, by a friend of hers. If we are to be governed by these laws, we must look to them for the description of those entitled to this privilege of redemption. If these laws had been applicable to a normal state of society and the prevalence of civil rule; if the stringent nature of these provisions did not contemplate the accomplishment of other incidental objects of '^public policy, to which the collection of the tax was legitimately accessory, I should be disposed to conform to the liberal rule laid down in the case of Dubois v. Hepburn, 10 Peters 1, “that it was not necessary for the purpose of justice, or to effectuate the object of such tax laws, that the right to redeem should be narrowed down by a'strict construction, and that any person who has an interest in the lands sold for taxes should be considered as the owner thereof for the purposes of redemption.” The original act •of August 6, 1861, was framed in this spirit, and gave this right to “the owners, their heirs, executors or administrators, or any person in their behalf. But when Congress came to legislate for a different state of things, and to send its tax-gatherers after its advancing armies in order to make the lands in military occupation tributary to the public fisc, and to recall the insurgent proprietors as rightful subjects of future as well as present taxation, Congress perceived the necessity of abandoning, so far as the insurrectionary districts were concerned, "its enactments for the districts where its authority was acknowledged and could be enforced by civil processes, and of substituting therefor in such “insur-rectionary districts” a different system, which, while it contemplated the raising of the direct taxes as its primary object, combined therewith the secondary and legitimate design of encouraging the return or promoting the settlement of a 103’al population. We cannot deny that these lands were part and parcel of the public domain ; as such, liable to taxes, and so to be treated in the financial policy of the Government as to subserve the needs, both future and present, of the treasury. To deny to Congress all but the simple function of resting these taxes from delinquent lands (and that, too, in the gentlest and most indulgent manner) during the lucky moments of a precarious military occupation, and to deprive that body of the incidental power *of fostering this source of income for future as well as present exigencies, would, in my view, weaken the government, and render it an easy prey to disaffected and rebellious subjects. While, therefore, entertaining no doubt of the rightful authority of Congress so to legislate, I am constrained to believe that, on this particular point as to the person entitled to redeem, the act of June 7, 1862, as contrasted with that of August 6, 1861, is perfectly plain and unambiguous. I do not see how any one can misunderstand or cavil about its terms. They are: ‘ ‘The owner, or some loyal person having lien or interest, &c., who upon appearing in person before the commissioners, taking oath to support the constitution of the United States, and paying tax, penalty, interest and costs, may redeem said lands from said sale.” It is no longer “the owner or any one in his behalf,” according to the terms of the act of, August 5, 1861; but “the owner, &c., who appears in person.” I do not think the tenant, in the first case, the squatter in the second, and the friend in the third, are within the terms or design of this description.
The appellee Hunter and Mrs. Towle allege that they were improperly denied the right of redemption within the two years allowed them, because of the minority of the one and the coverture of the other. It is contended by the appellants’ counsel that the application did not pertain to them personally, but to the guardian and the trustees. This objection seems to me too technical. I concede their capacity to apply for redemption; but when they applied, Congress had laid them (as I have endeavored to show Congress had a right to do) under new conditions by the act of March 3d, 1865. With these conditions they declined to comply, as I presume they could not, and thus lost the privilege which they were led “to hope and expect” by the previous acts. Whatever relief, therefore, they may think proper to seek, it must be sought from the legislative ^dispensers of such favors, and not from the courts, who expound and execute the laws such as they are.
But it is objected, that there was no necessity, nor, indeed, excuse for selling the entirety of these lands; that they admitted of division for sale, and a small portion of each would have brought the amount of the government dues. There are two sufficient replies to this objection. First — It is precluded by the effect which the act of Congress gives to the certificate of sale. In one part of the seventh section of this act it is declared, that “this certificate shall be received in all courts and places as prima facie evidence of the regularity and validity of said sale and of the title of the purchaser;” and in the concluding proviso of that section it is further said of this certificate, it shall only be affected as evidence of the regularity and. validity of the sale by three particulars, namely: 1. That the lands were not subject to tax. 2. That the tax was paid previous to the sale; or, 3. That the property had been redeemed conformably with this act. The purchaser, therefore, is entitled to rest upon this certificate, as determining the validity of the sale, and .of his title under it, unless it is impugned by proofs falling under one or the other of the heads already indicated. The complaint here affects the question of the regularity and validity of the sale, and is expressly precluded by this clause of the law. But if this were out of the way, or *562 we could go behind it for purposes of en-quiry into the legality of the sale, is it true that it was against law to sell the whole instead of so much as was needed for taxes and charges? Of course this must be decided by the language of the law. It is not for us to usurp the place of the lawgiver, and determine what in our opinions should have been the penalties, if any, to be affixed, under the circumstances, to this default in the payment of taxes. We have to abide the will of Congress, if constitutionally expressed, however it *may conflict with our own notions of justice or liberality. When we revert to the first law, and contrast its direction to sell “so much of the real estate as may be necessary,” &c., with the total omission of such language in the act applicable to “the insurrectionary districts,” and the substitution therefor of the broad and peremptory order for the sale of “the said lots and parcels of land,” without any limita.tion whatsoever of quantity, it seems to me impossible to resist the conclusion that this difference was designedly made by Congress with the views and policy clearly attested by all the distinguishing and remarkable features of this law. The commissioners were left no discretion, as in the first act, touching the quantity to be sold; but were required by Congress to sell all that was assessed to the delinquents. The sales were just such as were required by the act, and if excessive and unnecessary according to our views, must be deemed to have received the deliberate approval of Congress. I cannot, therefore, acquiesce in the propriety of vacating these sales, though conformable to the will of Congress, because of the practicability of reconciling the enforcement of taxes with a more indulgent mode of proceeding.
An immunity is claimed for the appellee Hunter on account of his pardon on the 4th September, 1865, by the President, which is set forth in the special verdict of the jury in his case. This is based on the idea that he had a vested right of redemption under the act of June 7, 1862, which was taken away by the act of March 3, 1865; and that this subsequent pardon avoided this latter act, ■ and restored to him his rights under the former. The authority of the late cases of Ex parte Garland, 4 Wall. U. S. R. 333, and Cummings v. State of Missouri, Id. 277, is invoked to sustain this position. These cases were held to be embraced by the constitutional prohibition against bills of attainder and ex post facto laws; and Mr. Justice *Pield, who delivered the opinion of the court, rested it on the principle that “the attorney does not hold his office as a matter of grace or favor,” and accordingly “his right to it is something more than a mere indulgence, revocable at the pleasure of the court or at the command of the legislature.” 4 Wallace 379. What, therefore, I have already said to fix the character of these acts, and to free them from anything in the nature of ex post facto penalties, contracts or j vested rights, must suffice to indicate the proper discrimination between the cases, and the grounds of my dissent from the pretensions thus advanced for this appellee on the score of his pardon.
The construction which I have placed on these acts has been assailed with much ingenuity because of an imputed inequality or want of uniformity in their operation under the theory I have advanced. The reasoning I have pursued would incidentally furnish to the thoughtful enquirer the answer I would make to this argument. But to prevent misapprehension, I deem it proper to take a more direct notice of it. The precise allegation is, that these laws operate unequally upon the loyal and disloyal subjects of the government. If by this it is meant to assert that there is a different mode of enforcing these taxes as between”these two classes, it is not true nor consistent with any theory of their operation. The taxes are exacted, and the forfeiture declared alike of the proprietor, whether he be in the Federal or the Confederate service; the same means of collection from him or his lands are adopted, whether he be an adherent of the United States, or in arms, or conspiring against it; so far as the great primary object is concerned of raising taxes, the lands are impartially and uniformly proceeded against, no matter where or who the delinquent proprietor may be; and the same terms and opportunities of paying before forfeiture are offered to all, whether loyal or disloyal. It *is very true that the same chances of relief were not enjoyed by all; that those who were in arms against the government could not be notified of their assessments or prepared to meet them with equal facility with those who were loyal. And it would be sheer folly to suppose that this was not clearly foreseen and contemplated by Congress, and advantage taken thereof to carry out a decisive policy for the fostering of its revenues from direct taxes, and the occupation and settlement of abandoned and forfeited lands in “the insurrectionary districts” with a loyal and tax-paying people. But surely it would not be becoming in those who abjured the government and left their homes to aid the rebellion, to plead in their own behalf disabilities voluntarily incurred by them, and from which the government would willingly have saved them.
But if it is meant to say that after forfeiture was incurred and the government was dealing with its own property, it dealt out its “acts of grace and favor” in the privilege of redeeming, unequally and not uniformly, as between the loyal and the disloyal, I cannot gainsay it. But it seems to me, with entire deference to others, to be an abuse of language to characterize such treatment as punishment or confiscation in disguise.
I have thus considered, with care, and, I trust, fairness, all the material points raised in this case by the able counsel of the appellees on their behalf. I have not *563 thought proper to comment on the authorities that were cited. These cases are eminently sui generis, depending on the construction of the acts of Congress, and can derive little, if any, elucidation from other cases or the apposite treatise of Blackwell.
I now turn briefly to an exception of the appellants to the refusal of the court to allow a removal of these causes to the United States Circuit Court. It is contended that these cases are embraced by the act of Congress of March *3, Í863, commonly known as the Habeas Corpus Act. I do not concur in that view. The language of that act will not apply to cases like those at bar, to try the title to and the possession of lands; and in nowise partake of the nature of those suits for “arrest, imprisonment, trespass, wrongs or omissions,” &c., specially and alone contemplated by that act. The motion for removal was, therefore, properly overruled.
I cannot conclude my investigation of these cases without expressing mjr sensibility to the sacrifices which the appellees have sustained. The amount of taxes was paltry as compared with the value of the forfeitures for non-payment. While under State laws it may be that the magnitude of these penalties have been approximated, if not equalled, yet it cannot be said that the impediments in the way of complying with the demands of the government, or the excuses for non-compliance, were at all equal. No one who considers the peculiar character of our late struggle, the nature of our twofold allegiance, the conflict of theories coequal with the origin of our national government, and the magnitude of the war waged by the revolted States under such a complete organization of an actual government as to exact from the United States, as well as foreign nations, the recognition and the rights of a belligerent power, can fail to extend to the private citizens of such States the consideration and indulgence with which their participation in the revolt should be extenuated. But this is a matter not cognizable by this court; and whatever relief is due to such considerations must proceed from the august will of the nation, whose disposition, at the proper time, to redress its citizens for unreasonable forfeitures, ought not to be doubted.
These views, of course, conduct me to the conclusion, that upon the facts agreed in one case, and found by special verdict in the two others, the law was for the defendants; *and that the judgment below should be reversed in all the cases.
JOYNI3S, J.
These are suits instituted by the several defendants in error against the several plaintiffs in error, for the recovery of lands sold by the commissioners of the direct tax, under the act of Congress passed June 7, 1862, and purchased by the plaintiffs in error. The validity of these titles is the main question in the cases, the facts of which, so far as it is necessary to consider them, are substantially the same.
By the act of Congress of August S, 1861, (12 Stat. at Barge, 292), a direct tax of twenty millions of dollars per annum was laid upon the United States, of which the sum of $937,550.66% was apportioned to the State of Virginia. This act contained minute and elaborate provisions for the valuation and assessment of the lauds upon which the tax was laid, and provided for the collection of the tax by distress of the goods and chattels of the tax-payer, and in case goods and chattels sufficient to satisfy the tax could not be found, by a sale of so much of the land assessed with the tax as should be sufficient to satisfy it, with an addition of twenty per cent. This act also provided that if, at the time of its going into operation, the people of any State should be in rebellion against the authority of the-United States, so that the laws of the United States could not be executed therein, it should be the duty of the President to execute the provisions of the act in such State as soon as the authority of the United States should be re-established. The owner or superintendent of any property charged with tax and advertised for sale was allowed to prevent a sale by payment of the tax, with an addition of ten per cent., at any time before sale; cind the owner, or his representatives, or any other person on his or their behalf, was allowed, at any time *within two years after sale, to redeem any land sold, by payment to the collector, for the use iff the purchaser, or his heirs or assigns, of the amount paid by the purchaser, with interest thereon at the rate of twenty per cent.
There are many other provisions in the act of August 5, 1861, but those which have been mentioned are sufficient to indicate the general character of the system established by it.
On the 7th day of June, 1862, Congress passed an act entitled “an act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes.” (12 Stat. at Barge, 422.) The 7th section of that act was amended by an act passed on the 6th day of February, 1863. (12 Stat. at Barge 640.)
By the first section of the act of June 7, 1862, it was enacted, that when in any State, or portion of a State, by reason of insurrection or rebellion, the civil authority of the United States is obstructed, so that the act of August 5, 1861, cannot be peaceably executed, the direct taxes by said act apportioned among the several States respectively shall be apportioned and charged in each State or part thereof, in which the civil authority is so obstructed, upon all the lands and lots of ground therein not ex- ! empted, as the same were enumerated and valued under the last assessment and valuation thereof under the authority of such State, prior to the 1st day of January, 1861; and each parcel of land was declared to be, by virtue of said act, charged with its proportionate part; according to value, of the tax apportioned to such State by the act of *564 August 5, 1861; and it was further provided, that in addition thereto a penalty of fifty per cent.' of said tax should be charged on said lands. The second section provides that the President shall, on or before the 1st day of July, 1862, declare by proclamation in what States, or parts of States, such insurrection exists; and that thereupon *the said several parcels of lands shall become charged with their respective portions of the said direct tax, and that “the same, together with the penalty, shall be a lien thereon, without any other or further proceeding whatever. ’ ’
The President issued his proclamation, in pursuance of this provision, on the 1st day of July, 1862, and that part of Virginia in which the lands in controversy lie was declared to be in insurrection against the authority of the United States, so that the provisions of the act 'of August 5, 1861, could not be peaceably executed therein. 12 Stat. at Large 1266.
Section three provides, that the owner of any parcel of land may, within sixty days after the tax commissioners shall have fixed the amount, pay the tax thus charged thereon into the treasury or to the commissioners, by virtue whereof the land shall be discharged from said tax. The fourth section is in the following words: “And be it further enacted that the title of, in and to each and every piece or parcel of land upon which said tax has not been paid, as above provided, shall thereupon become forfeited to the United States ; and, upon the sale hereinafter provided for, shall vest in the United States, or in the purchaser at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title and claim whatsover. ”
Subsequent sections, which need not now be noticed more particularly, provide for the appointment of tax commissioners,- who are to enter upon the discharge of their duties whenever the commanding general of the forces of the United States, entering into any such insurrectionary State or district, shall have established the military-authority of the United States throughout any parish, district or county of the same, for the sale of forfeited lands; for striking them off to the United States in certain cases; '*for the disposition by sale or lease' of the lands so struck off to the United States, &c., &c. Some of these provisions will be noticed' more particularly hereafter.
It is contended by the counsel for the plaintiffs in error, that by the provisions of the fourth section of the act of June 7, 1862, above quoted, any parcel of land upon which the tax is not paid within sixty days after the amount of it ' is ascertained, as provided by the third section, becomes, at the end of the sixty days, forfeited to the United States in such a sense that it, ipso facto, ceases to be the property of the former owner, and becomes the absolute property of the United States, -so that when it is afterwards sold, it is sold as the property of the United States, and that this loss of the property is inflicted upon the owner as a penalty for his default in the non-payment of the tax within the sixty days. This is the fundamental question in the present cases.
This section does not define, in terms, what is to be the effect of the forfeiture which it declares shall take place, so that we must resort to the common rules of construction to ascertain it.
It is incumbent upon the plaintiffs in error to make it clear, beyond all doubt, that it was the design of Congress to inflict such a forfeiture as they contend for. An intention to deprive a citizen of his freehold without trial, and in a manner never before practiced by the United States, will not be inferred by the court from general or ambiguous language, which will admit of a different interpretation. And in putting a construction upon the act of June 7, 1862, we must bear in mind the reasons for its enactment. The act of August 5, 1861, had provided for two great leading objects: 1. The proper assessment of the tax upon the several parcels of land; and 2. The collection of the tax so assessed. It. being found impossible to execute the provisions of that act in the insurrectionary ^districts, Congress, by the act of June 7, 1862, adopted other provisions for the accomplishment of the same objects in those districts, which were deemed better suited to their condition and more likely to be-effectual. That this was the reason for passing the act of June 7, 1862, appears distinctly from the first section. Any ambiguous words or provision's in that act should be construed with reference to those objects.
The language of the fourth section of the act of June 7, 1862, does not require the construction contended for. The terms “forfeited to the United States” do not necessarily import that the title shall be thereby divested out of the owner and vested in the United States. It is a rule of the common law, that where an act of Parliament declares that a person “shall forfeit” his lands to the King, or that a person’s lands “shall be forfeited” to the King, the title to the lands is not divested out of the owner and vested in the King by the mere force of the forfeiture. An inquest office is necessary for that purpose. And, therefore, when a man is attainted of high treason, whereby all his lands are forfeited to the King, the freehold remains in him until office found for the King, so that he shall be tenant to every precipe. Plowden Com. 486. Mr. Blackwell, in his work on Tax Titles, ch. 32, speaking of the effect of statutes which provide that lands shall “be forfeited to the State’ ’ for the non-payment of taxes, regards it as “a serious question whether an inquisition is not necessary, in order to divest the title of the rightful proprietor and vest it in the State,” and collects several cases in which that view has been maintained. It is otherwise if the intention of the Legislature is clearly indicated that the title shall pass by the mere *565 force of the forfeiture. Wild’s lessee v. Serpell, 10 Gratt. 405; Fairfax’s devisee v. Hunter’s lessee, 7 Cranch R. 603; United States v. Repentigny, 5 Wall. U. S. R. 211.
“'The question, therefore, is whether the intention of Congress is clearly indicated in this case, that the title of the owner shall be divested out of him, and vested in the United States, by the mere force of the forfeiture. The language, of the section seems plainly to indicate the contrary. It declares that “upon the sale” thereafter provided for, the title “shall vest” in the United States, or in the purchaser, at the sale. Section 7, which provides for the sale of the forfeited land, as it originally stood, and the same section as amended by the act of February 6, 1863, provides thd't the land shall be bid off for the United States by the tax commissioner, in case it does not bring a certain price fixed by the act, in which case it is declared by section 4, the title shall, upon such sale, vest in the United States. What need was there to provide that the title should vest in the United States, in case the land should be bid off for them at the sale, if it was already vested in them by the forfeiture? Indeed, how could the title by possibility vest in the United States by their thus becoming purchasers at the sale, when it was already vested in them by the mere force of the forfeiture? The provision in question, therefore, plainly implies that the title does not vest in the United States by force of the forfeiture, and that it will do so only in the event that the land shall be bid off for the United States at the sale.
The act of June 7, 1862, provides for two sales. The first sale is to be made of each several parcel of land upon which the tax remains unpaid, after advertisement stating distinctly the amount due on each, (sections 7 and 14), and each parcel is to be sold separately for not less than the tax, penalty and costs charged upon it, and ten per cent, interest on said tax. The act provides that this sale is to be made ‘in c.ase the taxes charged upon the said lots and parcels of land shall not be paid,” as provided by the third section. The act of February 6, 1862, “'recognizes the right of the owner, as we shall see hereafter, to prevent a sale by appearing in person before the commissioners, and paying the tax, with ten per cent, interest and the cost of advertising the land for sale, and recognizes his right also, without such payment, to control the sale by directin’g the land to be struck off to a purchaser other than the United States, at less than two-thirds of its assessed value. At this sale the United States becomes a bidder for the land. It is to be struck off to them at a sum not exceeding two-thirds of the assessed value, unless some person shall bid a larger sum. But within that limit the United States competes for the land with other bidders. Moreover, the act does not undertake to confer a complete and perfect title on the purchaser at this sale, but provides for redemption by the owner, or by any loyal citizen having an interest in or a lien on the land. There is another clause in the act of February 6, 1863, which is very significant. It is that which provides that lands which may be selected, under the direction of the President, for government use, mny be bid off for the United States at the sale. Now the long established and uniform course in the disposition of lands belonging to the United States, is to reserve from sale such parcels as are selected for government use. The land belonging already to the United States, this is the natural and convenient course. Why the departure in the act of February 6, 1863, from this reasonable and settled usage, if the land to be sold under that act belongs already to the United States? Why, in any case, should land that already belongs to the United States, be sold to enable the United States to hold it for government use? The provision allowing such lands to be sold, and providing for their being bid off for the United States at the sale, affords a very strong implication that Congress did not understand “them to be already before the sale the property of the United States.
Section 11 provides for a sale, if directed by the President, of lands bid in for the United States at the first sale. In this second sale, the original subdivision of the parcels of land is not regarded. The act also undertakes to give a complete and perfect title to the purchaser at this . sale, and directs that the whole proceeds of sale shall be paid into the treasury; one moiety of which it appropriates to certain specified purposes. There is no provision for paying into the treasury the surplus of the proceeds of the first sale.
Thus, the whole scheme of the act indicates, that at the first sale the land is sold as the property of the delinquent tax-payer, and not as the property of the United States; while at the second sale, it is sold as the property of the United States.
The eleventh section providing for a sale of lands bid off for the United States, contains no reservation of rights of redemption attaching in the first sale. And the provision of the act of February 6, 1863, providing for bidding off for the United States such lands as may be selected for government use, implies that there shall be no right of redemption is such cases, for such a right would defeat the object of the provision. It may be argued that these things show the United States does not acquire title as a purchaser at the sale in like manner as other purchasers, but holds by some other and better title. But all they can be really said to prove is, that the right of redemption from the first sale is not reserved to the owner as against the United States, in case they shall become the purchaser, but only against other purchasers. Whether"' that is the true construction, it is not necessary to enquire.
It was contended in the ^argument, that the forfeiture insisted on was provided by Congress as a penalty for non-pay- *566 merit *within the time prescribed by law, so as to induce the owner of the land to make prompt payment. It was further contended, that the constitution conferred upon Congress the same power to coerce the collection of taxes which the States' possessed; that the States possess the power of forfeiting lands for non-payment of taxes, and exercised it before the adoption of the constitution; in proof of which reference was made to a statute of Virginia said to have been enacted in the year 178S.
But this argument does not justify the conclusion that is drawn from it. It is conceded, on all hands, that the government of the United States is one of limited powers. It can exercise only such powers as are conferred upon it by the constitution. The powers of a State government, on the other hand, are limited only by the constitution of the United States, or of the State itself. It does not follow, therefore, that because a State legislature may provide that lands shall be forfeited to the State in case the taxes due upon them are not paid, the same power belongs to Congress. That power belongs to the State legislature, unless it has been denied to it; it does not belong to Congress, unless it has been conferred upon it.
This argument assumes that the forfeiture contended for was designed, like an ordinary penalty of ten or twenty per cent, of the tax, only as. a means of compelling the punctual payment of the* tax. But is that so? The penalty is wholly out of proportion to the object to be accomplished. The law does not provide that the commissioners shall give notice, by advertisement or otherwise, that the assessments have been made, or that they have entered upon the discharge of their duties in the county. The tax-payer may never know what he owes, until he has lost his land by the forfeiture. The penalty, therefore, .is imposed without actual default.
. I cannot resist the impression that this forfeiture, if it *is -such as contended for, was designed really to get the land, and not to get the tax. And this will appear more clearly from this: that it follows from the theory of the plaintiffs in error, that the forfeiture does not satisfy the tax, but leaves the party .still liable to pay it out of his goods and chattels, or other lands, under the act of August S, 1861. The payment of this penalty of forfeiture, without payment of the tax, will no more satisfy the tax than the payment of the penalty of twenty per cent., without payment of the tax, will satisfy the tax, under section 36 of the act of August S, 1861.
The power to collect taxes and to make all laws that shall be necessary and proper <10 carry that power into execution, includes all known and appropriate means of effectually collecting the taxes, unless some such means should be forbidden in some other part of the constitution. 18 How. U. S. R. 281. And it may be fairly inferred, that | when the people of the States conferred that ; power upon Congress, they meant to etn- ¡ brace all the means of collecting taxes then i used and employed by the States, as far as ! the same were consistent with other parts of the constitution. But it would not follow that they conferred, or intended to confer, the power of forfeiting land absolutely to the United States, as a penalty for the non-payment of taxes, even if it could be shown that such a power was then employed b3 the States. Where such a power has been exercised bj the States, it has not been as a means only of coercing the payment of taxes. It has been employed as a means of settling titles, as in this State, in the laws applicable to the western counties, which were the subject of adjudication in several cases reported in 10 Grattan’s Reports, or for some other purpose besides the mere collection of the taxes.
But if that was not so, this penalty of forfeiture is beyond the power of Congress. Such forfeitures proceed *upon the ground of a breach of the condition upon which every owner holds his land. The doctrine is thus stated in Blackwell on Tax Titles: “Every owner holds his estate upon the implied condition that he will furnish a list of his taxable estate, and promptly pay his share of the common burdens assessed against the entire community; and if he omits to comply with the condition, the paramount authority of the State, which is entitled to enter for the breach of this condition, comes in, as it has a- right to do, and declares the estate forfeited for the breach of the condition.” p. 460. This passage was cited by the counsel for the plaintiffs in error, as showing the principle, and the only principle, on which this class of forfeitures rests. How can this principle avail the United States in respect to lands the title to which was not derived from them, which are not held under their authority, and as to which they have not, either actually or in theory, the paramount title? How can such a right be claimed without trenching upon the local sovereignty of the States, and their paramount title and jurisdiction over the lands within their limits, which are fundamental principles of the constitution? If such a righ-had been claimed for the United States, ot been suspected to result from the provisionr of the constitution, while it was under diss cussion, it would undoubtedly have aroused the jealousy of the States, and provoked their earnest opposition, as being dangerous to State Sovereignty. We know, from the history of the times, that the clause giving to the United States exclusive jurisdiction over places purchased by the consent of the Legislature of the States for the erection of forts, &c., met with strong opposition on this ground. 2 Story on Const. 1224.
The exercise of such a power by Congress as is contended for in these cases is also inconsistent with the fifth article of the amendments to the constitution, which ^declares that no person “shall *567 be deprived of life, liberty or property without due process of law.”
In the case of Murray’s lessee v. Hoboken Land and Improvement Company, 18 How. U. S. R. 272, the question came before the Supreme Court, whether a title to land was valid which had been acquired by purchase at a sale made by a United States Marshal, by virtue of a distress warrant issued by the Solicitor of the Treasury against a defaulting collector of the customs, in pursuance of the act of Congress of May 15, 1820. 3 Stat. at Large 592. This depended on the question, whether the distress warrant, in pursuance of which the sale was made, was “due process of law,” within the meaning of the amendment to the constitution above referred to.
Mr. Justice Curtis, delivering the opinion of the court in that case, said: “That the warrant now in question is legal process is not denied. It was issued in conformity with an act of Congress. But is it ‘due process of law?’ The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it is due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article [fifth amendment] is a restraint on the legislative, as well as on the executive and judicial, powers of the government, and cannot be so construed as to leave Congress free to make any process ‘due process of law’ by its mere will.. To what principles, then, are we to resort to ascertain whether this process enacted by Congress is ‘due process?’ To this the answer must be two-fold. We must examine the constitution itself to see whether the process-is in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of *our ancestors, and which are shown not to have been unsuited to their civil and political condition, by having been acted on by them after the settlement of this country. ’ ’
The learned judge then proceeds to show, that from the earliest ages of the common law, summary methods had been recognized and practiced in England for the recovery of the debts due to the Crown, and especially those due from receivers of the revenue; that this diversity between what is ‘ ‘due process of law” in respect to public defaulters and ordinary private debtors was well understood in hjs country and entered into the legislation of the Colonies, and especially into that of the States, after the Declaration of Independence, and before the adoption of the constitution; that in England and in this country the remedy against public defaulters was by summary process, without judicial enquiry to ascertain the existence and amount of the liability, against the body, lands and goods, or against the lands and goods, or against the body and goods, corresponding substantially with the remedy provided by the act of May IS, 1820. He says : “As we have already shown, the means provided by the act of 1820 do not differ in principle from those employed in England from remote antiquity, and in many of the States, as far as we know, without objection, for this purpose, at the time the constitution was formed. ’ ’
It was held, therefore, that the warrant of distress, under which the land in that case was sold, was “due process of law” within the meaning of the constitution, and that the title acquired under it was valid.
Can a forfeiture of the land charged with taxes, such as is contended for in these cases, be regarded as “due process of law,” upon the principles established by that case? Eiterally speaking, it is not any process at all, but operates by force of law, and without any process or proceeding ^whatever, except, the ascertainment by the commissioners of the sum chargeable on the land. But that is probably immaterial.
The forfeiture of land to the Crown does not appear to have been a means recognized and employed in England, at any period of its history, for enforcing the payment of taxes or other debts to the Crown. If it had been, we should have found such forfeitures treated of iñ the English law books; but we no where find them mentioned.
The summary methods employed in England in early times for the collection of debts to the Crown seem to have been turned to purposes of oppression, and one of the chapters of Magna Charta provided for their restraint. Before that time, the King for his debt had execution of the body, lands and goods of his debtor, (2 Inst. 19,) but by Magna Charta it was provided, that the King should not seize any land or rent for any debt as long as the present goods and chattels of the debtors suffice to pay the debt, and' the debtor himself is ready to satisfy therefor. In conformity with this provision, a conditional writ was framed, commanding the sheriff to enquire of the goods and chattels of the debtor, and if they were not sufficient, to extend the lands. Mr. Justice Curtis quotes Gilbert as saying, that since the statute 33 Henry 8, ch. 39, the practice has been to issue the writ in an absolute form against lands and goods, without requiring any previous inquisition as to the goods. 18 How. U. S. R. 277. But Lord Coke, in the second Institute, gives the form of the writ, which he says was the usual process after the statute of 33 Henry 8, and down to his own day, and it is in the conditional form above mentioned, requiring a previous inquisition as to the goods, and providing for an extent upon the land in the event only that the goods shall prove insufficient. 2 Inst. 19. And Lord Coke, commenting upon this writ, says: “Wherefore it appeareth, that if *the goods and chattels of the King’s debtor be sufficient, and so can be made to appear to the sheriff, where *568 upon he may levy the King’s debt, then ought not the sheriff to extend the lands and tenements of the debtor, or his heirs, or of any purchaser or terre tenant.” Ib. The mode of collecting the land tax in England was by distress. The statute 4 W. & M. ch. 1, which established the land tax as it was continued by annual acts down to the period of the formation of the Federal constitution, provided that, for the collection of the tax, it should be lawful “to dist train the person or persons so refusing or neglecting to pay by his or their goods or chattels, or to distrain upon the messuages, lands, tenements and premises so charged, and the goods and chattels then and there found, and the distress so taken to keep by the space of four days, at the cost and charge of the owner thereof.” Sect. 12. The section goes on to provide, that if the money be not paid within four dajs, the distress so taken shall be sold for the payment of the money, and the surplus paid to the owner. Section twenty-nine of the same act provides, that in case any lands or houses be unoccupied, and no distress can be found on the same, nor the person of the owner found in the county where the land lieth, by reason whereof the assessment on such unoccupied lands and houses cannot be levied, the name of the delinquent, the sum assessed, and the place where the land lies, shall be certified to the Court of Exchequer, which certificate is declared to be a charge on the person of the debtor, and on the lands and houses named therein, and to make the person debtor to the Crown for the sum assessed, and that the Court of Exchequer shall issue out process thereupon against the body, goods and the other lands of the debtor, until the sum due be fully levied and paid. The same mode for collecting taxes by distress was provided for in the last of the ánnual acts imposing a land' tax, passed 38 *George 3, ch. 5. Many, if not all, of the intermediate acts’ between 4 W. & M. ch. 1, and 38 George -3, ch. 5, are omitted, except their titles, in the edition of the British statutes in the State library. But I have seen no reason for believing that any of them provided for a substantiallj* different mode of collecting the tax. . See 2 Burn. Eccl. Eaw, title Band Tax.
Mr. Justice Curtis, in the case above cited, refers to various statutes of the Colonies, and of the States before the adoption of the constitution, for the collection of public dues, and in all of them, as far as quoted by him, the process is given against the goods as well as the lands of the debtor, and generally with a provision that the lands shall not be taken unless the goods prove to be insufficient. In not one of them is there any provision for a forfeiture of the land, or for a proceeding in any form, against the land alone.
A statute of Virginia, said to have been ■passed in 1785, has been cited-to us as an instance in which a State, before the adoption ■ of the constitution, declared lands to be for- ! eited absolutely for the non-payment of taxes. This is the only instance of the • sort that has been cited to’us. But this statute was really not passed in 1785, but in 1790, when this sort of forfeiture was for the first time introduced in Virginia. 2 Revised Code of 1819, 517. Opinion of Judge Roane in Kinney v. Beverley, 2 Hen. & Mun. 518.
But suppose this statute had really been passed in 1785. To make it avail anything to the plaintiffs in error, it would be necessary to show tjiat forfeiture of the land for non-payment of the tax was one of the means then generally known and employed for the collection of taxes. An act of a single State, adopting a new and excep.-tional mode of proceeding, could have no weight in the argument.
*As I have already intimated, this class of forfeitures has not been employed in Virginia as one of the usual means of enforcing the payment of taxes, but rather for the purpose of establishing titles and settling vacant and abandoned lands. A reference to the act of 1790, and others which preceded it, will show what were then the ordinary methods of enforcing the payment of taxes, and in what cases and for what reasons the system of forfeiture applied. The whole series of these laws may be found in 2 Revised Code of 1819, 508 et seq.
The act of 1781 provided that the sheriff might distrain the lands, or slaves, goods or chattels which should be found upon the land, but that the lands should not be dis-trained ‘where other sufficient effects can be had thereon. ” Subsequent acts provided for an immediate distress upon lands, goods and chattels, and that the smallest number of acres of land should be sold which the lowest bidder would pay the taxes on. ^.n act passed in 1788, reciting that the usual mode of selling land “produced great oppression,” enacted that every such sale should be made on the premises, and that no sale should be made of any land for the payment of taxes, if other property sufficient belonging to the person chargeable could be found in the count}'. The same act provided for buying in for the State any land sold for taxes that should not bring one-half its value, with a right to the owner to redeem within two years; and that if it should not be redeemed within two years, it should be sold, and the proceeds of sale, after deducting the taxes, damages and expenses, paid over to the original owner of the land.
These reference's will show what were the ordinary methods of enforcing the payment of taxes in use in Virginia about the time of the adoption of the constitution. And'it may be worth mentioning, that before the adoption of the constitution of the United States, the leg-islature of *Virginia had re-enacted the provision of Magna Charta, that “no freeman shall be taken or imprisoned, or be deprived of his freehold, or liberties, or free customs, or be outlawed or exiled, or any otherwise destroyed, nor shall the commonwealth pass *569 ■upon him nor condemn him, but by the lawful judgment of his peers, or by the law of the land.” 12 Hen. St. at Large, 186.
Looking- at the spirit which animated all this legislation, we cannot doubt as to what would have been thought, at that day, of a statute declaring an immediate and absolute forfeiture of the whole land, as a penalty for non-payment of the tax within sixty days after the assessment of it, without notice to the owner, by advertisement or otherwise, of the assessment, and without any, even the least, effort to collect it.
Then came the act of December 20, 1790, above referred to, which introduced the principle of forfeiture. The first section repealed all laws then in force providing for the sale of land for taxes due thereon. The second section directed the sheriff to return a list of the lands where he cannot find in his county sufficient effects of the owner to satisfy the tax. The third section directs the auditor of the State, when it shall appear to him from the certificate of the county courts, or from other information, that a person chargeable with any such tax resides, or has slaves, or personal property, in some other county than that in which the land lies, to certify the amount of the tax to the sheriff of such other county, who is required to distrain therefor as for other taxes. Section 4 directs that a list of these insolvents, with the amount due from each, shall be furnished to the collector of taxes for the next year, who shall distrain for them, as for other taxes; and that in case such taxes cannot be collected in the succeeding year, the treasurer of the State shall cause to be advertised the names of the delinquents, with the quantity of *land and its location, and the amount of tax due thereon. And then the Sth section provides that, in case the tax on any tract of land shall not be paid for the space of three years, the right to the same shall be “lost, forfeited, and vested in the commonwealth,” and be subject to entry and grant as waste and unappropriated land.
It appears from this recital of the provisions of the act of 1790, that the forfeiture was not resorted to as one of the known and accustomed means of collecting a tax. It was resorted to as a new proceeding, when other means failed — when no effects could be found in the county, or in any other county, to satisfy the tax; and when, after advertisement, and a delay of three years, no person would pay it. It could hardly apply to any case in which the land had not been abandoned by the owner.
There is nothing, therefore, in the usages and modes of proceeding which prevailed in Lngland or in this country before, or at the time of, the adoption of the constitution, which authorizes me to say, according to the principles of Murray’s lessee v. Ho-boken Company, that a peremptory and absolute forfeiture of title at the end of sixty days, as contended for in these cases, is “due process of law” for the collection of taxes due to the United States.
It does not alter the case that this statute was enacted during a period of civil war, and was designed to operate within a territory in which the civil authority of the United States was for the time subverted. Congress still claimed Virginia as a Slate of the Union. That claim was distinctly asserted by the act of August S, 1861, laying and apportioning the direct tax, and quite as distinctly by the act of June 7,
1862, providing for the collection of the tax in the insurrectionary districts. This last act was passed in order to enforce compliance, by the people of those districts, with a duty devolved upon all the people, in pursuance of the constitution. It was not competent *for Congress, while professing to exercise a power given by the constitution, to trample under foot the restraints imposed upon it by that instrument. For example, Congress could not exercise the power of taxation, and disregard the rule of apportionment prescribed by the constitution, in respect to the States in rebellion. The power of taxation is not a war power, to be employed for the purpose of compelling the submission of men in arms against the government. In short, while the state of war might furnish the motive for such legislation, it could not supply the power to enact it. As was said by Mr. Justice Davis, delivering the opinion of the Supreme Court in Ex parte Milligan, 4 Wall. U. S. R. 2, 120: “The constitution of the United States is a law for rulers and people, equally in war and in peace, and covers, with the shield of its protection, all classes of men at all times, and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism; but the theory of necessity on which it rests is false, for the government, within the constitution, has all the powers granted to it which are necessary to preserve its existence.”
This forfeiture cannot be sustained as a forfeiture for crime, like the forfeitures which take place under the revenue and navigation laws, or under the act of August 6, 1861. In such cases, the thing forfeited is the instrument by which the offence was committed, or was the fruit of the offence, and is treated as being itself, in some sort, the offender. But the land of a delinquent tax-payer cannot be brought within the principle of this class of cases ; it is neither the instrument nor the fruit of any offence. Nor can we suppose that Congress intended to make it a criminal, or even a quasi criminal offence, for a man not to *pay his taxes, especially without notice of the amount of them. Nor can we suppose that Congress designed this forfeiture as a means of confiscating the property of persons in rebellion against the government. The acts of August 6, 1861, July 17, 1862, and March 13, 1863, make provision for the confiscation of *570 property iij. certain specified cases arising out of the rebellion, and embracing a large number of acts. We must suppose that these acts embrace all the cases in which Congress thought it proper to provide for this, extraordinary and exceptional' mode of punishment. We are not at liberty to say that Congress designed, by the act of June 7, 1862, to establish another system of confiscation covertly, under the disguise of a system for the collection of taxes, and especially one that would embrace those that were innocent of participation in the rebellion as well as those who were guilty, and one that would forfeit the land in fee simple, when, by the avowed system of confiscation established by the act of July 17, .1862, it could only be forfeited for the life of the offender. 12 Stat. at Iyarge, 627.
Moreover, if we regard this forfeiture as designed for the punishment of persons in rebellion against the United States, the provision is liable to a still graver objection.
In that view of the act, it declares, in effect, that the non-payment of the tax within sixty days is sufficient evidence of participation in the rebellion, and is a legislative conviction and punishment, without trial, of all who fail to pay. This is a violation of that provision of the constitution which inhibits Congress from passing a bill of attainder. According to the decision of the Supreme Court in Cummings v. State of Missouri, 4 Wall. U. S. R. 277, that provision applies to every act of Congress which assumes guilt and inflicts punishment without judicial trial, whatever be the character or degree of the punishment *inflicted. It matters not that the person is not reached. The deprivation of property is equally a punishment. It matters not that it is not called a punishment, but only purports to be a stringent measure for the collection of taxes. If it is, as I am now supposing, a legislative deprivation of property for participation in the rebellion, Congress could no more inflict it under the disguise of a system for the collection of taxes than it could inflict it for the avowed purpose of punishment. As was said by Mr. Justice Field, delivering the opinion of the Supreme Court in Cummings v. The State of Missouri: “The purpose of the law-maker, in the case supposed, would be openly avowed; in the case existing [upon the view I am now considering] it is only disguised. The legal result must be the same, for what cannot be done directly, cannot be done indirectly. The constitution deals with substance, not shadows. Its inhibitions are levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile provision.”
For these reasons, I am constrained to think that it was not within the constitutional power of Congress to declare that, upon non-payment of the tax within sixty days, the land charged with the tax should be absolutely forfeited to the United States. It follows, that if, on the true construction of the act of Juné 7, 1862, it provides for such a forfeiture, the plaintiffs in error could acquire no title by their purchases. The forfeiture-did not vest the title to the lands in the United States, and the commissioners could not pass a title to them as the property of the United States.
As I have already stated, however, I do not think that *we are compelled to place that construction upon the act of Congress. The forfeiture seems to have been provided for as a means of enabling the United States to make a sale of the land. Whether it was appropriate for .that purpose, or upon what particular theory, or with what particular view, the provision was made, is wholly unimportant, if I am right in holding that it was not designed, by its own mere force, to divest the title out of the owner and to vest it in the United States.
It remains to enquire into the regularity of- the proceedings under which the plaintiffs in error claim title.
The act of February 6, 1863, provides, that the certificate of sale “shall be received in all courts and places as prima facie evidence of the regularity and validity of the sale and of the title of the purchaser in purchasing under the same.” And the last provision of that act declares, that the certificate of the commissioners shall only be affected as evidence of the regularity and validity of. the sale by establishing: 1. That the property was not subject to taxes; or, 2. That the taxes had been paid previous to sale; or, 3. That the property had been redeemed according to the provisions of that act.
The first objection taken to the sale is, that the whole land was sold; -when it appears from the facts that the land might have been divided without prejudice to it, and a part of it sold for enough to pay the sum due to the United States. It was contended by the counsel for the defendants in error, that the commissioners had no authority, upon a proper construction of the act, to sell the whole land when the money charged upon it might have been made by the sale of only a part of it. He contended further, that the certificate of sale was not intended, in anj case, to preclude enquiry into the authority of the commissioners to make a sale, but that it was intended only to preclude enquiry (except on the grounds specified) in*respect to the regularity of the proceedings of the commissioners, in cases where they had authority to sell. On the other side it is contended, that the act contemplates that the whole land charged with tax shall be sold, in every case, and that it does not allow any impeachment of the certificate, on the score either of irregularity or want of authority, except on the grounds specified. I do not think it necessary to decide these questions. I will assume, for the present purpose, that *571 the view taken by the counsel for the plaintiffs in error, on these points, is the correct one. The substance of it is, that the act requires that in all cases the whole land .shall be sold, whatever its value, and whatever the amount of the tax, even though an inconsiderable part of it would suffice to pay the tax, and that, after a sale has been made, there shall be no enquiry to ascertain whether the tax might not have been paid by the sale of part of the land.
Now the authority of Congress to make a sale at all results from the power to la y and collect taxes, and the power to pass all laws which shall be necessary and proper to carry that power into execution. How can it be said that a sale of the whole laud, in every case whatever, is “necessary and proper” as a means of collecting the tax due upon it? According to the decision of the Supreme Court in McCulloch v. State of Maryland, 4 Wheat. U. S. R. 316, when any measure, in its nature, is appropriate as a means of carrying into execution a power expressly granted by the constitution, Congress is the sole judge of the necessity of adopting that means in the particular case; that is a question of legislative discretion, not of judicial cognizance. But in every case it must appear that the measure adopted, in its nature, is appropriate as a means of carrying the granted power into execution.
How can it be said that a sale of the whole land, in every case whatever, is appropriate as a means of collecting *the tax upon it? Can the sale of five hundred acres of land be appropriate as a means of collecting a tax, which might be collected by the sale of one acre? Congress might just as well direct that the whole of the defendants’ estate should be sold under every execution, without reference to the value of the estate or to the amount due on the execution.
To avoid a misapprehension of my meaning it is proper to add, that I am not now questioning the power of Congress to declare that the certificate of sale shall, as between the owner and the purchaser, be conclusive as to the necessity or propriety of selling the quantity of land actually sold in the particular case, where a discretion is given to the commissioners to sell the whole land, if part of it cannot be sold, without injury to the residue, or in any like case. I am only questioning the power of Congress to declare that, in every case, the whole land shall be sold.
Another objection to the sale, insisted on by the counsel for the defendants in error is, that before the sale of the land, though after the expiration of the sixty days, the amount of the tax, penalty and costs was tendered to the commissioners, who refused to receive it; that this was equivalent, in legal effect, to the actual payment of the money; and that, as the only a uthority to make a sale at all was to raise the money due, the payment, or the tender and refusal of the money, before the sale, put an end to the authority. The answer made to this is, that by the provisions of the act, no payment of the money, after the expiration of the sixty days, could prevent a sale, except only a payment of it by the owner in person; and that Congress had a right to require payment from the owner in person because the land was, by the forfeiture, already the property of the United States.
The counsel for the defendants in error insists, that the *act of February 6, 1863, does not require that payment, after the expiration of the sixty days and before the sale, shall, in order to prevent a sale, be made by the owner in person, and that the provision as to the owner appearing in person and paying the money has reference only to the authority of the commissioners to bid in the land for the United States.
I do not concur in this view. I think the plain meaning of the act is, that if the owner will appear in person and pay the money, the land shall not be sold. Why receive the money if the land is to be sold notwithstanding? And what owner would pay the money if it would not save his land from sale? Then does not the provision that the owner, by appearing in person and paying the money may prevent the sale, imply that a sale cannot be prevented by the payment of the money by any other person? I think it does. Fx-pressio unius, exclusio alterius.
But I think the objection to the sale is well founded. In the view of the act of Congress which I have endeavored to establish, it only authorizes, or could authorize, a sale to be made for the purpose of raising the money due. If the money is paid, no matter by whom, before a sale is made, the reason for the making a sale ceases, and the authority to make it ceases also. If the money, instead of being actually paid, is tendered to the commissioners, and they refuse to receive it because not tendered by the owner in person, the legal effect is the same as if it had been paid. Their refusal to receive the money, which they ought to have received, cannot give them an authority to sell which they would not have had if they had done their duty by receiving
it. There was, in these cases, an offer to pay the money by persons who appeared before the commissioners for the purpose, and were prepared to do it, though there was no actual production and tender of the *'monejr. But actual production and tender of the money were not necessary, when the commissioners declared to the parties who offered to pay that they would nqt receive it. Vide Bacon Abr. Tender, F. Congress might require payment by the owner in person as a condition of redemption after sale. It might, in the act directing the sale, allow redemption on such terms as it might prescribe, or it might refuse to allow it at all. But the case is otherwise when the payment is offered before sale.
The result is, that the plaintiffs in error acquired no title by their purchases.
The application is each of these cases to *572 remove it into the Federal Court, in pursuance of the act of March 3, 1863, was properly overruled, as the act does not embrace such cases.
I think the judgment of the District Court in each of these cases should be affirmed.
MOJSTCURF, P., concurred in the opinion of Joynes, J.
Judgment affirmed.