THE STATE OF FLORIDA EX REL. THE ATTORNEY-
GENERAL, PLAINTIFF VS. JAMES E. JOHNSON, DE-
FENDANT.

1. Under the statute regulating the payment of poll taxes since
   June 12th, 1892, a tax collector has no right to refuse to re-
   ceive such taxes when tendered by a party on behalf of others
   from whom they are due, although the person making the
   tender is not authorized by the other persons to pay the same;
   and the refusal of a tax collector to receive poll taxes so ten-
   dered is within the grounds for which a Governor may under
   section 15 of Art. IV of the Constitution, suspend an officer.

2. The Comptroller, under the power implied by the provisions of
   section 363, R. S., that tax collectors shall pursue the instruc-
   tions which from time to time may be transmitted to them by
   him, may give any reasonable instruction for carrying out the
   law as it is, but cannot give collectors any power which the
   law does not give them.

3. Should, as is claimed by the answer and admitted by the de-
   murrer in this case, the Governor instruct a tax collector, who
   is subject to suspension by him to pursue a stated course of ac-
   tion in the performance of an official duty involving private
   rights, and the Comptroller advise such officer to pursue a con-
   trary course, and the tax collector pursue the latter course, and
   the Governor suspend him for doing so, and the courts find
   that the course advised by the Governor was that prescribed
   by law, and that claimed to have been advised by the Comp-
   troller contrary to law. and that such violation of law was
   within the grounds for which the Governor is authorized to
   suspend such officer, they could not review the action of the
   Governor in making the suspension. The power of review is

in the Senate alone. The same would also be true if both the Attorney-General and Comptroller had advised such contrary course.

4. Where a Governor, acting on a case which is within his constitutional power, has suspended an officer, questions such as the reasonableness of the office hours of the officer suspended, and the *bona fides* of a person making the tender of payment of poll taxes, for refusing which the officer was suspended, are entirely within the exclusive jurisdiction of the Governor and Senate, and can not be considered by the courts.

The order of removal appears in the former opinion in this cause, (*ante* p. 433.) The Governor's notification to Johnson of the cause of suspension is as follows :

STATE OF FLORIDA,
EXECUTIVE DEPARTMENT,
TALLAHASSEE, FLA , Oct. 29, 1892.

*James E. Johnson, Esq., Jacksonville, Fla. :*

SIR—Upon my return to the capitol I find the letters, affidavits and arguments of counsel in your behalf, all of which have been duly considered.

There is no room for doubt that the Constitution places in the hands of the Executive the power to suspend all officers that have been appointed or elected who are not liable to impeachment, without reference to when the Legislature may meet, the adjournment of the next session of the Senate terminating the period of suspension, unless the Senate should remove the officer so suspended. This authority involves, as well, a duty on the part of the Executive to exercise

such power whenever he finds that an officer is guilty of conduct which brings his case within the Constitutional grounds set forth for which suspension may be made.

Twelve persons, to-wit: Messrs. Porcher L'Engle, I. L. Harris, G. E. Wilson, D. E. Thompson, R. F. Bowden, J. A. Peterson, F. F. L'Engle, G. Muller, Uriah Bowden, T. H. Livingston, E. W. Gillen and Claude L'Engle, make affidavit that, when Mr. Porcher L'Engle made you the tender of money to pay the poll taxes for a large number of persons, he demanded that you receive the list of names and the money and make out receipts at your leisure and send them to the parties whose poll tax was thus attempted to be paid, only insisting that such receipts be dated as of September 3, A. D. 1892. Messrs. Porcher L'Engle, George E. Wilson, F. F. L'Engle, D. E. Thompson, Clauae L'Engle, T. H. Livingston, Isaac L. Harris, Uriah Bowden and R. F. Bowden add in further affidavits that Mr. L'Engle did not request you to give or send such receipts to him. Messrs. P. B. Bedford, William H. McCurdy, M. Johnson, R. C. Scott, Pleasant A. Holt and John Price make affidavit that, in making the tender, Mr. L'Engle demanded that the receipts be delivered to him; but they differ otherwise as to the demand for the receipts. Mr. P. B. Bedford says that Mr. L'Engle stated: "I want their receipts to-day." Messrs. Johnson, Holt and McCurdy say that Mr. L'Engle demanded the receipts be issued or delivered to him dated that day; and Mr. Scott says that Mr. L'Engle demanded that the re-

ceipts be made out "when he (you) could do so,"· whether that day or not, and when issued they should be dated September 3. Mr. Price qualifies his testimony as follows: "I could not pretend to report the exact words used by Mr. L'Engle, but the impression made upon my mind was that he demanded that the receipts when issued be dated that day, and when the receipts were issued be delivered to him. Nearly all state in substance that there was considerable noise and confusion at the time. On this point Mr. Joseph A. Jackson says there was so much disorder and noise in the room that it would be difficult for any person to tell exactly what other persons were saying.

While the testimony on this point is somewhat conflicting, the decided weight of testimony is that the tender was not coupled with the demand that the receipts be delivered to Mr. L'Engle; besides which it is not reasonable to suppose that Mr. L'Engle would have made such demand in the light of my instructions to you, of which he was advised. Nor does it anywhere appear that you offered to accept the taxes and send the receipts to the persons for whom paid, or that your refusal to receive the poll taxes so tendered you was based upon the demand of Mr. L'Engle that the receipts be delivered to him; but the ground upon which you refused was, as you stated, that your office was closed, and would not be open again till 9 o'clock Monday morning.

I can not accept as a sufficient excuse for your refusal to receive the poll taxes tendered that some persons on the list were dead or not liable to pay a poll tax (this you could not know at the time), or that you did not have time on that day to examine the assessments, or to see from whom poll taxes were due. It is not denied that the poll taxes were due from a large majority of those on the list. There remained still more than eleven hours of the time within which the poll taxes might be paid to enable persons to vote at the State election, whereby a large number would have qualified, even if it were true that you could not properly continue such examination after that date.

The facts are that notwithstanding you had good reason to know that a large number of the citizens of your county had not paid their poll taxes and that the time within which such poll taxes could be paid to enable them to vote at the State election would soon terminate, you unreasonably restricted your office hours to three hours a day, continuing such restrictions up to and on the last day when the payment of a poll tax would enable a person to vote at the State election, well knowing that a large number of persons would thereby be disfranchised. On such day a few minutes after 12 o'clock, and more than eleven hours prior to the expiration of the time limited by law, a tender of the poll tax was made to you at your office for a large number of the citizens of your county, which you refused to receive, whereby they were de-

nied the right of suffrage, one among the highest rights and privileges of an American citizen; this by an officer of the State and himself a candidate for re-election. Such conduct constitutes gross neglect of duty in office, for which you are suspended by executive order, herewith inclosed.

Respectfully,

F. P. FLEMING, Governor.

The other facts are stated in the opinion.

*The Attorney-General* for the Plaintiff.

*A. W. Cockrell & Son* for the Defendant.

RANEY, C. J.:

The defendant has filed an answer which is demurred to by the State, through the Attorney-General, as insufficient in law. Upon the law of the case as it has been settled by the former opinion, there is but one inquiry which this court can now make, and that is: whether or not the act for which the alleged suspension was made is as matter of law a ground for removal within the grant of power made to the Governor. It is admitted on all sides that the courts can not inquire into the sufficiency or insufficiency of the evidence to prove that the defendant did or did not do what he is charged to have done, and has been suspended for doing, if the charge is, in its nature, one for which the Constitution authorizes suspension; and

this principle removes from our consideration a large portion of the record. We have of course decided that what is stated in the order of suspension is at least neglect of official duty. The cause of suspension communicated to the defendant by the Governor under date of October 29th of this year is clearly the same as that stated in the order of suspension of like date; so whatever may be the power of the court where the causes communicated did not in judgment of law constitute due cause for suspension, there is now no occasion for the consideration of such power.

It is contended that it is apparent that the suspension has not been made for the violation of any law or any instruction of the Comptroller, but for a violation of instructions of the Governor which are contrary to both the law, the instructions of the Comptroller and the opinion of the Attorney-General. The cause of suspension, as shown by the order of suspension and the executive letter communicating the cause, is the refusal of the defendant to receive from Porcher L'Engle, on the third day of September. of this year, the poll taxes of William Marvin and others for the years 1890 and 1891. such taxes having been tendered by L'Engle to defendant as Tax Collector, in behalf of such persons, citizens of Duval county, and that day being the last day of which poll taxes could be paid so as to enable persons to vote at the then next ensuing general election, whereby such persons were lenied the right of suffrage.

One point urged is, that it does not appear that L'Engle was authorized by Marvin or any of the other persons referred to in the order of suspension and other papers to tender the taxes referred to.  As it does not appear in the order of suspension or the charges communicated that L'Engle was so authorized, our former opinion might be considered conclusive of this point; yet we have not hesitated to test its soundness by fuller consideration and examination of authorities ; and we are entirely satisfied that it is not incumbent on a Tax Collector, but on the contrary, is a violation of his duty to attempt to inquire into the right of one person to pay the poll taxes of another under this act.  The · statute gives him no such power.  It is for the elector, and him alone, to decide whether or not he will take advantage of such payment and ratify an act thus done in his behalf by another.  There is nothing in the nature or terms of the statute that takes away this right, or attempts to empower the collector to do so.  The argument that the tax receipts, if delivered to a third person, may be used by such person to influence improperly the exercise of the elective franchise, loses sight entirely of the fact that all officers are presumed to do their duty, and of the consequent fact, so patent upon the face of this statute, sections, 154, 173, 354, R. S., of the utter immateriality of the receipt to the voter, if the collector performs the duty of reporting the payment to the registration officer, and the latter officer does his duty

of noting on the registration lists, required by law to be furnished by him to the inspectors of the different election districts, the names of all persons who have paid their poll taxes. These duties are clearly prescribed by the act of May 25th, 1889, (secs. 342 and 173, R. S.) Whether or not the collector may and should withhold the tax receipts from anyone not presenting due evidence of authorization by the voter to take his receipt, is not before us; yet it is entirely clear that whatever argument might have been legitimately drawn in support of the idea that he should do so, from the provision of the fifth section of the act referred to, that electors whose names have not been so noted by the Supervisor of Registration may vote on producing their tax receipts at the polls, is, in so far as it applies to the duty of the collector to receive the taxes and report payment to the Supervisor of Registration, of no avail now, as the fifth section is not to be found in the Revised Statutes, and consequently has not been in force since June 12th of this year. Application for the receipt, like voting, would ratify any payment of the taxes in his behalf. The right of the tax payer to adopt and ratify, and the duty of the Tax Collector to receive, is firmly established by the authorities in avoiding the sales of prop erty where there has been such tender; Bennett vs. Hunter, 9 Wall., 326; s. c. 18 Gratt., 100; Tacey vs. Irwin, 18 Wall., 549; Atwood vs. Weems, 99 U. S., 183; United States vs. Lee, 106 U. S., 196; Reading vs. Finney, 73 Penn. St., 467; and we fail to perceive how, under a statute like the one under consideration,

a court can refuse to recognize it in cases involving the exercise of the elective franchise; which right of franchise the judiciary can attach no qualifications to, but must always hold clear of any impediment not clearly prescribed by law. We do not mean to say that there is in the purpose of the requirement of the payment of a poll tax as a prerequisite to voting, nothing which suggests that it might be provided even by implication that only the voter or his duly authorized agent should be permitted to pay the tax, but our view is that in this act as it stood after the 12th of June last there is nothing authorizing the conclusion that such is its purpose or effect. Its provisions, in so far as it is necessary to notice them, are simply that no one shall be permitted to vote at an election who shall have failed to pay, at least thirty days before the day of such election, his poll taxes for two years next preceding such election, sec. 154, R. S.; a capitation tax of one dollar shall be assessed annually against every male citizen of this State of the age of twenty-one years and upwards, and if the Tax Assessor fail to assess it the collector may; and the latter may collect and receipt as in the case of other such taxes, sec. 341; and that thirty days prior to any general, special or municipal election the collectors shall furnish Supervisors of Registration a list of all persons who have paid their capitation taxes for two years next preceding the year of the election, sec. 342; and further, sec. 173, the Supervisor of Registration shall note on the registration books, which he shall furnish to the inspectors of the different election districts, the names of all persons

registered therein who shall have paid, at least thirty days before the day of election, their poll or capitation taxes for two years next preceding such election, as shown by the lists furnished to the supervisor by the Tax Collector, and only such persons shall be deemed qualified voters or authorized to vote at any general, special or municipal election. It is also provided, §343, that the Comptroller shall furnish the collectors with receipts in book form with stub duplicates, which receipts shall be issued by collectors to all persons upon payment of the taxes, and shall state the name of the party so paying.

It remains for us to consider the general contention, stated above, that it is apparent that the suspension has not been made for the violation of any law, or any instruction of the Comptroller, but for a violation of instructions of the Governor which are contrary to law, the instructions of the Comptroller and the Attorney-General.

Stating chronologically the facts relied on, it appears that on August 6th, of the present year, the Governor enclosed to the defendant copies of affidavits of prior date which complained :

1st. That the latter had refused to furnish to candidates and respectable citizens of Duval county, lists of persons who had paid their poll taxes;

2d. That he refuses to receive the poll tax of one person tendered for him by another and to give the latter the receipt for the tax.

No further notice need be taken of the first of these complaints. The second is based on an affidavit of Porcher L'Engle to the effect that he went to defendant's office on August 4th and tendered two dollars to pay the poll taxes of E. R. Bliss, a registered voter of Duval county, for the years 1890 and 1891, and that defendant refused to take the money and give affiant the poll tax receipt therefor. Of the second the Governor says: "In reference to the second complaint you are instructed that the imposition of a poll tax creates a debt to the State from an individual who may be liable therefor—the proceeds to be used for the benefit of public schools. Your duty requires you to collect such debt, as well as any other State or county taxes, and to receive and receipt for the same at any time and from any one who offers to pay it, whether from the party from whom it is due or another who may tender the money." On the 9th of the same month defendant replied to the Governor's letter, and as to the poll tax complaint, said: "It is true that Porcher L'Engle tendered the amount of taxes assessed against Bliss, as set up in his affidavit, but the affidavit suppresses the fact that I received the money tendered on behalf of Bliss, who was not present, made out a receipt to him, enclosed the receipt in an envelope, postpaid, addressed to him, sealed it and handed it to Porcher L'Engle to be mailed by him, upon his intimation that I would not mail them; and that thereupon L'Engle tore open the

envelope, and when I suggested to him that this was perhaps an offense against the postal laws, he threw the receipt and envelope back to me, remarking that unless the receipts were given to him he would not pay for them, and took back the tax money. I hand you the receipts and envelope as torn by Mr. L'Engle. The statute presented in section 343 of the Revised Statutes has been construed by the Comptroller, and I have simply obeyed their instructions in reference to poll taxes being paid by other than the tax payer." On August 11th the Governor wrote acknowledging defendant's letter of the 9th, and upon the subject of paying poll taxes, he said: "When I wrote you in reference to receiving payment for the poll tax and the delivery of the receipt therefor, I was not aware that you had received a letter from the Comptroller in reference thereto, (which, however, is stated to be a personal letter) notwithstanding the fact that I enquired of Mr. W. M. McIntosh, Jr., clerk in the Comptroller's office, in the absence of the Comptroller, as to whether or not instructions upon the point raised had been given by such office. I was informed by Mr. McIntosh that he was not aware of any. The Comptroller, in a letter to me written the ninth instant, gave me the information, for the first time, that he had written you in reference thereto, and referred me to his said letter of June 23d last. In view of the letter of the Comptroller I will modify my intructions to you as follows: You will receive the poll tax

from the party from whom it is due, or from his agent. or any person willing to act in his behalf by paying the same, the receipt for such poll tax to be delivered to the party from whom such tax was due, or his authorized agent. I notice your reference to the Attorney-General. I am informed by that officer that he has no recollection of rendering an opinion in reference to the poll tax being paid by one party for another. I return the Bliss envelope and receipts."

It appears from the answer that on June 22d, at Jacksonville, the defendant had written the Hon. W. D. Bloxham, who was then, as he is now. Comptroller, the following letter:

JACKSONVILLE, FLA., June 22, 1892.

*Hon. W. D. Bloxham, Tallahassee, Fla. :*

DEAR SIR :—There are certain parties here who volunteer to pay the capitation tax of others, and take the receipts in the name of the persons for whom the payment is made, without their consent or knowledge, and deliver their receipts to them or not as they see fit. Now would you consider it my duty to issue poll receipts in such wholesale manner, and do you think I would be justified in so doing, and would it not be better for me to require the presence or demand from each and every person for whom a poll tax receipt is issued and deliver the same to the owner, and the one having the right to use it, because you might pay my poll tax, put the receipt in your pocket, and

The State of Florida ex rel. v. J. E. Johnson.—Opinion of Court.

if the supervisor be of mind not to note the payment on the registration book, then I would lose my vote in October and November. Please advise.

Yours truly,

J. E. JOHNSON,

Tax Collector.

To this letter defendant received the following reply on or about June 24th:

TREASURY DEPARTMENT, STATE OF FLORIDA,
COMPTROLLER'S OFFICE,
TALLAHASSEE, June 23, 1892.

*J. E. Johnson, Esq., Jacksonville.*

DEAR SIR:—Your personal favor just to hand, and I give a prompt personal reply. That question was up some years ago, and the ruling of the Comptroller was that the law did not *require* the collector to give receipts to any persons for the capitation tax except those who were entitled thereto. You state that there are certain parties who volunteer to pay the capitation tax of others, and take the receipts in the name of the person for whom the payment is made, without their consent or knowledge, and deliver said receipts to them or not, as they see fit. You ask if I think it your duty to receive capitation taxes thus tendered. I certainly do not, and there is no warrant of law for it. By reference to section 4, Chapter 3850, approved May 25th, 1889, you will see that "receipts shall be issued by collectors of taxes to all persons upon payment of taxes hereinbefore required, and shall state the name of the party so paying," etc. Section 2 of

33

the above law refers to "lists of all persons *who* have *paid their* capitation taxes for two years," and section 3 also refers to the "*names* of all persons who have paid their capitation taxes." I can readily see how one individual might use undue influence by paying and controlling a thousand poll tax receipts. Like all laws you must exercise good judgment. This is simply a personal note.

Yours truly,

W. D. BLOXHAM.

Should you want a legal opinion, you can write to Hon. W. B. Lamar, as I think he gave this view of the case.

The answer of defendant further states: "That on the afternoon of August 9th, the defendant called upon the Comptroller at his hotel in the city of Jacksonville, and exhibited to him the above letter of August 6th from the Governor, with the affidavits attached thereto, and asked the Comptroller for instructions in relation to the defendant's duty in receiving poll taxes from persons other than those from whom such taxes were due or their authorized agents, and also exhibited to the Comptroller the above letter from the latter dated June 23d; and that at such interview the Comptroller reiterated the instructions contained in said letter of June 23d, and positively and emphatically instructed defendant to receive no poll taxes from other than the tax payer or his duly authorized agent, and stated that these same instructions had been given to defendant's predecessor in office, D. P.

Smith, in 1890, with the knowledge and approval of the Governor and Attorney-General, and that complaint had been made to the Governor in 1890 against said Smith on account of his refusal to receive poll taxes from persons who could not exhibit evidence of agency for persons whose poll taxes they desired to pay, and that the Governor, Attorney-General and Comptroller had then approved of the action of said Smith therein, and that the ruling then made had never been overruled or changed by the Comptroller, but that it was still the ruling maintained under the advice of the Attorney-General. That the Comptroller on said 9th day of August, wrote a letter to the Governor on the subject of the said interviews and advice so given to defendant, stating that defendant was acting in compliance with the direct instructions of the Comptroller, and that he, the Comptroller, was responsible therefor, which letter the Comptroller read to defendant before mailing, and the Comptroller again, a very few days thereafter, wrote the Governor on the same subject, reaffirming (as defendant is advised and informed by Comptroller, and upon such information and belief affirms the fact to be) the propriety of his said instructions to defendant, and insisting that it was not the duty of defendant to receive poll taxes from any one other than the persons from whom such taxes were due, or their authorized agents. That defendant has made demand upon the Governor for copies of said two letters to him from

the Comptroller, but the Governor has declined and refused to furnish copies thereof, but admitted in response to such demand that he was in possession of such letters."

Defendant then says in his answer: "That he refused to receive the money from L'Engle for the poll taxes alleged to have been tendered for William Marvin and others in pursuance of the positive, direct instructions of the Comptroller, of which fact the Governor was cognizant before his alleged suspension of respondent from office." And again it is said: "That in respect of his action on September 3d, 1892, he pursued the instructions, oral and in writing, communicated to him by the Comptroller, in respect of which instructions this respondent had no discretion, as the law, section 363, Revised Statutes, made it the duty of this respondent, enforced by his oath of office, to obey the instructions of the Comptroller. True it is, the Governor of Florida had instructed this respondent, as shown by his letters of August 6th and 11th, 1892, that it was respondent's duty to receive poll taxes from anyone who was willing to pay them; the Comptroller instructed this respondent it was not his duty to receive poll taxes from anyone other than the tax payer or his agent duly authorized in that behalf."

In connection with these allegations, another part of the answer is to be considered. It is defendant's reply of October 13th, to the Governor's notification of the 8th of that month, that the defendant should show

cause on the 14th why he should not be suspended for, among other things, the refusal of defendant on the 3d of September to receive the money then tendered by L'Engle for the poll taxes of Marvin and others. In this stated reply of October 13th, he says: "Early in August last, Mr. Porcher L'Engle, claiming to represent parties who were candidates for office on the ticket with him, appeared at my office and tendered money for poll taxes for various persons, and demanded that the poll tax receipts be delivered to him. I informed him that if he would prepare and deliver to me the list of names of persons for whom he, or any persons whom he desired to represent, wished to pay poll taxes, and would give me the money necessary to pay the poll taxes for the persons named, I would issue the receipts and send them to the persons whose poll taxes were paid; but I declined to give him the receipts for persons unless I had evidence that he was authorized to receive the receipts. I deemed it necessary to take this action because of the fact that I was informed, and believed, and still believe, that it was the intention of various persons, Mr. L'Engle among the number, to procure the poll tax receipts for a large number of persons, many of whom they were not authorized to represent, and then hold their receipts, refusing to deliver them except in cases where the persons named would agree to vote at the October election according to the dictates of the persons holding the receipts. In this position I understand that I was complying with my duty as understood by me and by the Comptroller and yourself. As I have informed

you in a former communication in answer to a charge
made bv Mr. L'Engle who was then attempting to pro-
cure my removal, Mr. L'Engle declined to pay the
poll taxes unless I would deliver the receipts to him,
and in one case he went so far as to tear open an en-
velope, sealed, stamped and addressed, and delivered
to him to be mailed.

"Mr. L'Engle claimed, and appeared to be acting for
all parties who were candidates on the ticket with him,
and I believed then, and still presume, that Mr.
L'Engle informed the other parties acting with him
of my offer to receive the money with the lists and
deliver the receipts to the persons for whom the taxes
were paid. This is the same ruling that I made in
dealing with the candidates and representatives of the
ticket upon which I was a candidate. There was no
distinction made in treating the parties, but there
was marked difference in the way that I was myself
treated. When Mr. L'Engle was insisting on coming
into my office and procuring lists of persons who had
paid their poll taxes, he had been informed that, if he
had names for whom he desired to pay the poll taxes,
and would give me the list, I would inform him as to
whose taxes had already been paid, and upon payment
for those not paid, I would issue receipts and deliver
them to the proper parties upon payment of the
amounts due me. Mr. L'Engle refused to do this,
and informed me that he had a right to examine my
books at his pleasure, and to pay poll taxes and re-
ceive himself the receipts, and that he intended to in-
sist on that right and to do everything in his power to

have me removed from office if I did not comply with his wishes in those matters.

"A few days before the 3d of September, Mr. L'Engle met me and informed me that he had a list of names for whom he intended to pay poll taxes and demanded the receipts, and I informed him that, if he would come to my office during office hours and tender the money with the names, the receipts would be issued to the parties named. I asked him to bring them in as soon as practicable. Two or three days before the 3d day of September I was informed by a gentleman who claimed to have information from persons acting with Mr. L'Engle that Mr. L'Engle intended to appear at my window at the last minute on the 3d day of September and tender the payment of the poll taxes for two or three thousand names, composed of names of persons, very many of whom were dead or moved away from the county, and I stated that, if the list was presented to me during office hours with the request that I deliver the receipts, I should certainly accept the money and issue the receipts to be delivered to the persons named. I have reason to believe that this information was conveyed to Mr. L'Engle, and that he thereupon determined to wait until after the closing of my office at 12 o'clock on the 3d of September, and then make the tender, knowing that the money could not be received, and hoping to make political capital of his action. I was further informed, and believed, that for the purpose of making a tender after office hours, Mr. L'Engle had arranged for the

use of a considerable sum of money for a couple of hours time, agreeing to return the money within that time."

The answer further states that defendant delivered this letter to the Governor in the Executive office at Tallahassee on the day of its date, and that defendant then and there orally requested the Governor to inform him what law of the State, if any, he was charged with violating, and that to this request the Governor replied orally that it was not claimed that L'Engle had been authorized by the persons named to pay their taxes for them, and that defendant was not charged with the violation of any law of the State, but that defendant was charged with having violated the instructions given him by the Governor, in the foregoing letters of instructions; and that thereupon respondent insisted that he had violated no law, and had acted in pursuance of instructions from the Comptroller, and called the Governor's attention to the letter of instruction of June 23d, from the Comptroller, and that to this the Governor replied that this letter from the Comptroller was only a personal letter, and that respondent was not charged with the violation of any particular law, but only with having violated the instructions from the Governor contained in the letters from the latter.

It is also stated in the answer that, upon the receipt by the Governor of the last letter mentioned above as having been written to him by the Comptroller, the Attorney-General, in an interwiew with the Governor,

advised the latter that the defendant could not properly or legally receive poll taxes from another than the tax.payer unless the person so paying was then and there authorized by the party from whom the poll tax was due to pay the same; and that satisfactory evidence of this authorization should . be exhibited along with the tender, in order that the collector be protected in receiving such payment. In this connection it is proper to state that upon the hearing the following agreement, dated December 23rd, 1892, and signed by the Attorney-General and counsel for defendant, was filed: " It is agreed that the following statement of fact be considered by the court, in connection with the answer of respondent, in determining the demurrer of relator thereto: The Attorney-General, in justice to Governor Fleming and to himself, states that the last paragraph to the Governor's letter of date August 11th, 1892, to James E. Johnson, contained in the answer herein, as follows; 'I note your reference to the Attorney-General. I am informed by that officer that he has no recollection of rendering an opinion in reference to the poll tax being paid by one party for another,' was written, as Governor Fleming states this day, from a belief that the Attorney-General had not before the day of said letter advised the Comptroller at any time as to the payment of poll taxes by one person for another, such belief being as he states founded as he considered it on the statement of the Attorney-General to him. But the Attorney-General states his recollection as positive that on a day previous to the date of the above letter, he had,

in a conversation with the Governor, stated to him that he had previously advised the Comptroller at his request (though not by a written or formal opinion) that no person should be permitted by the tax collector to pay the poll tax of another and deliver to him the poll tax receipt of that other, unless the person so paying or offering to pay was the agent of such other person, and exhibited at the time satisfactory evidence of his agency. It is further agreed that the Governor offered through the Attorney-General to furnish to A. W. Cockrell, Esq., copies of the telegrams from the Executive to D. P. Smith, if the same could be found in the Executive office; and to furnish a copy of the list of 722 names, referred to in the answer; but that he declined to furnish same to J. M. Barrs, Esq., for the reason that he, the Governor, deemed the letter of J. M. Barrs, Esq., asking for same, as discourteous. Further, that the Governor declined to furnish copies of the Comptroller's letters to him, as stated in the answer, because the same were stated in said letters from the Comptroller to be personal letters."

The answer also states that "the Comptroller and Attorney-General of the State now insist and still advise this respondent that the instructions so communicated by the Comptroller to this respondent were in all respects, in their opinion, legal and proper."

The question which arises on all this matter, viewed in connection with the order of suspension and the communication of the causes of suspension, both of which are a part of the answer, is, what is the answer the law makes to the condition of respondent?

We are entirely satisfied that the Comptroller's letter of June 23rd can not be justly constituted as advancing the opinion that the poll taxes could be received from no one but the tax payer or his duly authorized agent. The inquiry put to him and which he was answering when he wrote that letter, did not involve that single proposition, but coupled with it the condition of taking the tax receipts upon making the payments. What is said by him after stating and directly answering the inquiry is more properly an argument in support of such direct answer, whatever may have been his views on the single question of the right to make the payment. And it is equally clear that considering the answer of respondent in connection with the agreement of December 23rd, between the Attorney-General and counsel for respondent, that the Attorney-General's opinion, as expressed to the Comptroller, does not extend to the simple question of who may make the payment without requiring possession of the receipt.

In view, however, of other allegations of the answer as to the Comptroller recited above, and of the admissions of the demurrer, it can not be denied on this hearing that he instructed the defendant at an interview in Jacksonville in the month of August to receive no poll taxes from any other persons than the person by whom the tax was due, or his authorized agent, or that the Comptroller on the same day wrote a letter to the Governor on the subject of such interview, and stated that defendant was acting in compliance with his direct instructions, and that he, the

Comptroller, was responsible therefor; and again, a few days after, wrote the Governor reaffirming the propriety of such instructions, and insisting that it was not the duty of defendant to receive poll taxes from any one other than the tax debtor or his authorized agent; or that such letters were received by the Governor. Nor, for similar reasons, can it be denied that the defendant on the 14th of October, which was prior to the suspension, insisted before the Governor in the Executive office at Tallahassee, that he had in his action of September 3rd violated no law, but had acted in pursuance of instructions from the Comptroller, and called the Governor's attention to the Comptroller's letter of June 23d, and that the Governor replied that such letter was only a personal letter.

It is certainly clear from what appears above as to the Bliss tax matter of August 4th, that on that day and August 9th, the date of Johnson's letter as to it, the defendant's understanding of his duties, and of the Comptroller's construction of the law, was that the tax might be paid by another person than the person owing it, provided the receipt was delivered to the voter; and it is indisputable that the defendant's written reply of October 13th, to the Governor's notice to him to show cause why he should not be suspended, which reply was handed to the Governor on the 14th of October just mentioned, plainly states that such was his own view of the law, and also his understanding of the Governor's and Comptroller's view, as applicable to the Marvin matter of September 3rd; and

the controlling issue on the investigation or trial before the Governor, as shown by the affidavits *pro* and *con*, and the letter of the Governor communicating the cause of suspension, was whether L'Engle had demanded a delivery of the tax receipts to himself, or that they be given to the tax debtors, which issue, as shown by the order of suspension and the communication just mentioned, was found by the Governor in favor of the latter proposition. It is apparent then that the defendant's answer to the alternative writ not only represents himself as occupying two irreconcilable positions before the Governor in defending the charges made against him, but also as entertaining equally inconsistent understandings of the Comptroller's views. But ignoring these inconsistencies, and giving the answer its fullest effect in favor of defendant, and assuming that the Comptroller did advise the defendant not to receive poll taxes except from the tax debtor, or his duly authorized agent, and that the defendant acted on this advice in the matter of September 3d, and that all this was known to the Governor when he made the order of suspension, the proposition which presents itself is whether this puts the Governor's action beyond the pale of his power; or, in other words, whether, in judgment of law, the instructions of the Comptroller prevent the action of the collector from being cause for suspension within the meaning of the Constitution. If so, then a tax collector can not be suspended for anything that he

may do, if it is supported by an oral or written instruction from the Comptroller. We have already decided, both in this and the former opinion, that the statutes of this State permit one person to pay the poll tax of another, without authority from the latter, and that the latter may adopt or take advantage of the act. The Comptroller, under the power implied by the provisions of sec. 363 R. S., that tax collectors shall pursue "the instructions which from time to time may be transmitted to them" by him, may give any reasonable instruction for carrying out the law as it is, but he can not repeal a law or deprive a citizen of his rights thereunder. He can not give tax collectors any power which the law does not give them ; their "powers, duties and compensation" are prescribed by law; Sec. 16, Art. VIII of the Constitution. As the law authorized the payment of poll taxes in the manner we have indicated, it was a violation of legal duty for a tax collector to prevent its being done, and the Governor in the exercise of his exclusive executive functions has found, as shown by the order of suspension and the letter communicating the cause of suspension, that the defendant has violated this law by refusing to permit payments to be made in that manner. If the law had not authorized payments to be thus made, but, on the contray, had required them to be made according to the alleged instructions of the Comptroller, we should have held that the Governor's action was without authority of law, or be-

yond the power given him by the Constitution, and that his order of suspension was void, as we also should have done had he suspended the defendant for enforcing the views announced in his reply of October 13th.

The fact that the Governor, pending the investigation, said to the defendant that the latter was not charged with the violation of any particular law, but only with having violated the instructions from him contained in his letters, can not change the fact that the Governor has, as shown by the subsequent order of suspension and the notification of the cause of suspension, suspended the defendant for a violation of law. Such assertions, though not well considered, can not change the law, nor defeat the jurisdiction given by the Constitution to the Governor, where the lawful record of his action shows that he has suspended an officer for that which in his judgment of law is "good cause" therefor. Where a Governor finds that an officer, who is subject to the suspending provision of the Constitution, is doing under the advice of the Comptroller and Attorney-General that which he believes to be contrary to law and an invasion of private rights, and he notifies the officer of this belief, and directs a change of action, and afterwards the officer notified continues to pursue the same course of action, and the Governor suspends him for so doing, and the question is brought before the courts, whether the suspension is void or within the Governor's power, there can be no doubt that the courts will be compelled to

hold that he has acted within his power, and that the Senate is the only power that can sit in judgment upon the propriety of his suspension.

The communication from defendant to the Governor, and the correspondence between the Comptroller and the defendant subsequent to the order of suspension are immaterial matters, but assuming that they had preceded it, they are clearly within the conclusions announced above. The same observation is applicable to the present advice to respondent, imputed by the answer to the Comptroller and Attorney-General.

The law establishes no office hours for collectors of taxes in this matter, and hence the proper hour of closing the office, like the *bona fides* of L' Engle's tender and all other matters not specially referred to above, are considerations which address themselves exclusively to the Governor in forming his judgment as to suspension; the Senate, and not the courts has power to consider them and review his judgment thereon.

The peremptory writ must be awarded, and will be issued, returnable on the thirty-first day of the present month, at the hour of 4 o'clock p. m. It will be so ordered.